### COOK v. AUTOMATIC FIRE PROTECTION CO. et al.

(District Court, S. D. New York.   February 9, 1915.)

No. 5–130.

1. PATENTS ⬤=211—LICENSE CONTRACTS—CONSTRUCTION.
　　Contracts relating to the granting of licenses under patents *held* valid and operative, and also construed, and the rights of the parties thereunder determined.
　　[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 304–311; Dec. Dig. ⬤=211.]

2. ESTOPPEL ⬤=3—ESTOPPEL BY PLEADING—DENIAL OF CONTRACT.
　　Where defendants alleged a contract between the parties as the one by which their rights were to be determined, in which they were sustained by the court, the fact that complainant denied the contract does not deprive him in a court of equity of the right to its benefits, nor relieve defendants from its obligations.
　　[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 2–5, 7; Dec. Dig. ⬤=3.]

⬤=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. EQUITY ⊂⊃87—LIMITATIONS—STATUTE GOVERNING—APPLICATION.

   Where, in the execution of a contract in suit between a corporation and others, intended by the parties to be under seal, mere scrolls were used, which were valid as seals in the state where the contract was made and expected to be performed and in the state of suit, the fact that they were ineffective to make the contract a sealed instrument in the state where the company was incorporated does not require a court of equity to apply the statute of limitations governing suits on unsealed instruments.

   [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 242–244, 395; Dec. Dig. ⊂⊃87.]

In Equity. Suit by Frank R. Cook against the Automatic Fire Protection Company, the Fire Protection Development Company, James G. Nolen, and Robert L. McElroy. Decree for complainant.

Jones, Addington, Ames & Seibold, of Chicago, Ill., for plaintiff. Griggs, Baldwin & Baldwin, of New York City, for defendants.

ROSE, District Judge. [1] This controversy centers around the inventions of the defendant James G. Nolen. He is an electrical engineer and inventor. He and the complainant, Frank R. Cook, had been acquainted for many years. In the fall of 1902 Cook was engaged in business in Chicago as a manufacturer of electrical supplies and fittings. Nolen, together with his brother, had jointly invented a method by which a sprinkler system would automatically report whenever it got out of order, and would in like manner turn in an alarm whenever a fire started in a building protected by it. On September 11, 1902, they applied for a patent therefor. This application was subsequently divided, and ultimately resulted in the granting of two letters patent, viz. Nos. 805,874 and 860,560. About this period Nolen had other inventions in various stages of progress. His head was apparently filled with more or less promising ideas. On the 24th of October, 1902, he and Cook entered into an agreement which recited that he had made certain improvements or inventions in connection with what were known as automatic sprinklers and fire alarm systems, for which he was about to make application for letters patent; that Cook was engaged in the manufacture and sale of electrical apparatus, and proposed to furnish the funds necessary to obtain the patents for such inventions and to manufacture them for sale. By the terms of this instrument Nolen granted to Cook an undivided half interest in the inventions then made and any improvements upon them which might subsequently be made and developed by Nolen. It contained a clause which read as follows:

   "It being understood that either party is not to sell or assign any of the said inventions or improvements thereon, or grant any licenses, shop rights, or otherwise part with any interest whatsoever in the inventions and patents to be obtained thereon."

Cook agreed to make applications for letters patent on such inventions already made, or to be made, as should be deemed practicable and marketable. He was to pay the cost of so doing, and that cost was to be deducted from the first proceeds derived from the sale of

the apparatus. He was to furnish means to develop, perfect, and make said inventions for sale in the open market. He was to continue to manufacture them so long as there was a demand for them, and was to use his best skill and uttermost endeavor to place them upon the market. The profits from the manufacture and sale of the inventions and appliances were to be equally divided between the parties; the actual cost of manufacturing, together with 10 per cent. as a manufacturer's profit, being first deducted. Cook was to begin their manufacture and sale as soon as practicable. Nolen procured from his brother an assignment of the latter's half interest in the application of September 11, 1902, and then assigned one-half of the whole invention to Cook. He went to work in Cook's factory to develop his various inventions, and between that date and March 11, 1904, made other applications which ultimately resulted in the granting of more than a dozen additional patents for various electrical devices, some of them suitable for use in connection with the sprinkler fire alarm system, and some which in all probability would not be so employed. From time to time Cook advanced money to Nolen. He paid out some $1,600 in Patent Office fees and charges and in compensation to patent solicitors. He supplied labor, materials, and the use of his factory. His expenditures for all these purposes aggregated, according to his present impression and testimony, somewhere between $6,-000 and $7,000.

In the spring of 1903 Nolen and one Hewitt jointly invented some improvements in sprinkler systems. On the 28th of April, 1903, Cook, Nolen, and Hewitt and a man named Green entered into an agreement which recited that in addition to the application of September 11, 1902, Nolen had made six others, and that Hewitt and Nolen had jointly made another invention for which application for letters patent were then in course of preparation; that Cook had advanced $780, had spent in and about the development of the devices the sum of $535.12, had guaranteed the payment of certain Patent Office fees, and had by virtue of certain oral and written contracts, dated October 24, 1902, with Nolen, acquired an interest in all of such inventions and the patents issued, or thereafter to be issued, thereon. The agreement then provided that Nolen, Cook, and Hewitt should assign to a trustee, to be mutually agreed upon by all the parties, all their rights in such inventions and in the patents to be obtained therefor. The trustee was to hold the rights for their mutual benefit and to dispose of them in accordance with their instructions. In the event of such disposition the trustee was to receive the consideration therefor and to pay $7/24$ of it to Nolen, a like amount to Hewitt, $6/24$ to Green, and $4/24$ to Cook. By this contract Cook and Nolen mutually released each other from all obligations arising under and by virtue of the contract of October 24, 1902, in so far as it applied to the inventions and letters patent to be obtained therefor. There were certain provisions which enabled the other parties to get rid of Cook by paying $5,000 for his interest. It was provided that in disposing of the inventions the trustee should stipulate that if the assignee should become insolvent, or should otherwise fail to place the inventions on the market, all right

in them was to revert to the parties to the agreement in the proportion that their respective interests in the inventions should bear to the entire interest. It was further provided that, if satisfactory arrangements should not have been completed within one year and a reasonable number of some of the patented devices by that time manufactured and sold, then the patents and all rights thereunder were to revert to, and become the exclusive property of, the parties in the same proportion and to the same extent as they and each of them at the date of the making of the agreement owned and possessed such patents. Thereafter each of the parties was to have the right to manufacture and sell said articles without in any wise being required or compelled to account one to the other, or to any of them.

It was a curiously drawn agreement. It was very difficult of actual performance, or at all events was very unlikely to be performed. Cook and Nolen seem to have come to that conclusion very early, for on the 29th of June, 1903, they entered into an agreement with the defendant McElroy which entirely ignored the existence of that of April 28th. The later contract recited that Cook and Nolen were the owners of certain inventions and improvements in fire alarm and signal systems and apparatus, which were then being perfected and for which applications for letters patent had been made; that McElroy was desirous of operating under the patents to be obtained thereon in connection with the giving of signals or alarms of fire, and wished to acquire the exclusive right to make, use, and install any and all inventions or improvements for that purpose which had been made, or which might be made, by Cook or Nolen, or either of them. Cook and Nolen gave such license to McElroy as trustee. The instrument recited that it was understood that the license should include and relate to the rights in such inventions or improvements as had been or might be made by Cook or Nolen in connection with systems for giving signals or alarms of fire or burglars, automatic sprinklers, and other purposes of like nature. McElroy was to pay Cook and Nolen 3 per cent. of "all gross money received" from "the users of said inventions or improvements" of Cook and Nolen. McElroy agreed that the 3 per cent. should not be less than $2,000 per year. If he failed to pay the minimum license fee, the license was to become null and void, and to revert to Cook and Nolen. The agreement contained a proviso, which it appeared Cook caused to be inserted, to the effect:

"That the license should take effect and have force from and after the 1st day of May, 1904, provided said Robert L. McElroy, trustee, shall within 60 days thereafter elect to accept and act under the license aforesaid; this agreement constituting an option whereby the said Robert L. McElroy, trustee, may within the 60 days elect to accept or refuse the license aforesaid."

It appears that one of Cook's purposes in requiring the insertion of this clause was to avoid any conflict with the agreement of April 28th, which by its terms would expire on the same day in 1904, unless various things were done which Cook felt sure never would be. The agreement of June 29, 1903, was under seal. It was understood by all the parties that McElroy was acting, not as an individual, but for

and on behalf of the defendant the Automatic Fire Protection Company of Maine, and that it was for it that he was trustee.

It seems that at the time this agreement was made neither Hewitt nor Green knew anything of it, nor did McElroy have any knowledge of Cook's and Nolen's contract with them. The day after the agreement of June 29th was executed, Hewitt in some way heard of it. He at once told one Shepherd, who, with McElroy, was interested in the Automatic Fire Protection Company, of the contract of April 28th. Various negotiations among all the parties followed, the upshot of which was that they all agreed that the interests of Hewitt and Green should be confined to inventions relating to the automatic fire extinguishing system, and should not include any of those having to do with signaling. To carry this purpose into effect, on the 11th of August, 1903, a new contract among Cook, Nolen, Hewitt, and Green was entered into. By it the agreement of April 28, 1903, was expressly canceled and declared null and void.

It was provided that in the automatic fire extinguishing system, for which letters patent had been or might be applied for, Hewitt and Nolen were each to have $^{17}/_{48}$ and Green $^{14}/_{48}$. From the construction subsequently put on this provision by the parties, it seems that Nolen was to hold one-half of his $^{17}/_{48}$, or $^{17}/_{96}$, for himself, and the other half for Cook. In the signaling apparatus and devices Cook and Nolen were each to have a one-half interest. Below the signatures of the parties an additional clause was added, and initialed by all of them. It declared that the agreement—

"shall extend to and be binding upon the heirs and assigns of each of the parties hereto. Said Hewitt, Green, and Cook hereby release the said Nolen from any contract or obligation, either written or oral, which said Nolen may have with them, or either of them, as to future inventions."

The contract was executed in quadruplicate. The four copies were delivered to Shepherd, to be held by him in escrow as trustee; Cook's signature being conditioned upon Shepherd's securing an exclusive license and right to McElroy, as trustee, from Nolen, Green, and Hewitt in the several patents then applied for, or which might be applied for, and described in the contract. Such license was to be on the basis of 2 per cent. of gross sales, rentals, or other receipts from the devices. If such licenses were not received, the contract was to be returned to Cook. If the license was given, Cook was to have the option either of accepting $^{17}/_{96}$ of said 2 per cent., or by bearing one-sixth of the expenses, in no event to exceed $2,500, in making the demonstration of the utility of the sprinkler devices, to become entitled to receive 3 per cent. If Cook was not satisfied with the license given to McElroy, those conditions which were unsatisfactory to him, so far as his interests were concerned, were to be left to an arbitration committee of three to be selected in the usual manner, their findings to be final. If the committee's findings resulted in Shepherd being unable to secure a license complying therewith, the four copies of the agreement bearing Cook's signature were to be returned to him. A satisfactory license was to be obtained within a year's time; otherwise, the contract was to be at an end.

Three days later, on the 15th of August, Nolen, Green, and Hewitt granted McElroy an exclusive license, applicable to any inventions or improvements made or to be made by any of them in connection with sprinkler equipments or devices of any nature whatsoever. McElroy was to pay them quarterly 2 per cent. of the gross rentals of their sprinkler apparatus or device; Hewitt and Nolen each to have $^{17}/_{48}$ and Green $^{14}/_{48}$. On the same day Nolen entered into an agreement with McElroy and Shepherd by which he undertook to serve them faithfully and diligently in inventing and perfecting devices, appliances, equipments, attachments, and improvements in fire alarms and signal devices for fire alarms and other purposes, and in systems and methods of signaling, and in such other matters and things as might be suggested or requested by McElroy and Shepherd, and devised and invented by Nolen within the period of three years, for which Nolen was to receive the sum of $150 per month, payable semimonthly. This agreement included all inventions and improvements, except those in automatic sprinkler equipments, devices, and appliances described in the contract of even date with McElroy, trustee.

It has been suggested by counsel for the defense in this case that the agreement of October 24, 1902, did not cover the application of Nolen of September 11, 1902, because it is said that the agreement referred only to applications thereafter to be made. I do not think that such was the intention of the parties at the time they entered into the agreement. The subsequent action of all of them shows that they understood the application of September 11th to be included under the agreement of October 24th. Indeed, that invention was the basic one. Unless all the parties felt that Cook had an interest in it, it is utterly improbable that the others would have dealt with him for the next 18 months as they did.

Cook claims, on the other hand, that the proviso added to the agreement of August 11th, surrendering his interest and that of Green and Hewitt in all subsequent inventions of Nolen, was limited to such inventions as had to do with the sprinkler system, as distinguished from the alarm or signaling system. In view of the relation the parties then occupied to each other, and the substantially contemporaneous action of some of them, this contention cannot be sustained. It appears probable that the purpose of this clause was to get rid of the interest of Hewitt, Green, and Cook in the subsequent inventions of Nolen, no matter to what such subsequent inventions might relate.

It is not shown that the agreement of August 14th between McElroy and Shepherd, on the one part, and Nolen, on the other, was communicated to Cook; yet it is difficult to believe that he did not know or have reason to think that Nolen had entered into their employ. He was thereafter very little about Cook's factory. About that time he ceased to receive any appreciable sums of money from Cook. The latter must have known that he was employed elsewhere.

At this period Cook recognized that McElroy, or rather the company represented by McElroy, the defendant the Automatic Fire Protection Company of Maine, was the exclusive licensee under the automatic fire alarm patents, and so notified persons who requested infor-

mation about the installation of systems embodying such patents. He knew that they were manufacturing under those patents. He did part of the work of such manufacture and sent them bills therefor. The first of these were for materials delivered. They were paid with reasonable promptness. He had other work on hand for them. It was not completed promptly, as they thought, because of his tardiness, as he says, because they did not give him proper directions concerning it. On the 18th of March, 1904, he personally submitted them bills for something over $500 for work thus far done by him and for which he had not been paid. The charge was apparently in larger part for work not yet completed, but still in process of manufacture. The others thought that his charges were excessive, and told him so.

At this interview it appears that some question was raised as to whether McElroy proposed to accept the option given him by the agreement of June 29th. The accounts of what was said on that subject differ. Cook claims that he told the others that if he was not paid his bills he would cancel the option of June 29th. They say he expressed reluctance to go on with the work they had given him, because he did not know whether McElroy would accept the option or not, and that thereupon McElroy verbally accepted it. By some letters written by some of the defendants at that time it would appear that their then recollection of the conversation was the same as that now stated by them. In point of fact, all the parties appear to have gotten very angry. It is likely enough that each of them may, in the course of the interview, have made statements not altogether consistent with what they said at another part of it. Very possibly the recollection of none of them is now absolutely accurate, at least as to the precise connection in which were uttered words they remember.

However this may be, on March 22, 1903, McElroy in writing notified Cook that he elected to accept the option under the contract of June 29th. A week later Cook replied, also in writing, that he canceled that option. On the next day McElroy answered, denying that Cook had any right of cancellation, and notifying the latter that he intended to insist upon the enforcement of the agreement of June 29th. On the 29th of March Cook wrote Shepherd that the agreement of August 15th between McElroy, Hewitt, and Nolen was unsatisfactory to him, in that it in no wise recognized and protected his rights, and that he elected to terminate the escrow of the conditional contracts of August 11th. Shepherd on the next day replied. He told Cook that he was prepared to secure him either $^{17}/_{96}$ of 2 per cent., or of 3 per cent., as Cook chose. He called his attention to the provision for arbitration in the event that the license given by Hewitt, Green, and Nolen was unsatisfactory to him. He told Cook that he was willing to submit to such arbitration. He said that Nolen had authorized McElroy to pay Cook the $^{17}/_{96}$ of the 2 per cent., or of the 3 per cent., so that his rights were fully recognized and protected. He concluded by stating that the contracts were in force and that he would deliver them to the several parties entitled to them.

To this letter Cook made no reply, and on the 25th of July a Mr. Hatch, since dead, who was then counsel for Shepherd and McElroy,

wrote Cook, transmitting to him one of the four copies of the contract of August 11th and one of the original licenses of August 15th from Nolen, Hewitt, and Green to McElroy. He also inclosed the written authorization and direction of Nolen to McElroy to pay Cook $17/96$ of the 2 per cent. royalties, or the same proportion of 3 per cent., if Cook contributed the $2,500 already mentioned. Mr. Hatch stated that such authorization of Nolen met the only objection which Cook had at any time suggested to the license of August 15, 1903. On the 12th of August, 1904, Cook wrote the Automatic Fire Protection Company, acknowledging some request he had had from them for an itemized bill. He asked instructions about completing work which he had in hand for it, or an instruction that it did not want it completed.

On the 20th of September the same counsel who now represents Cook wrote Hatch, telling the latter that they believed he represented all interests adverse to Cook in the matter of the controversies on fire alarm and sprinkler system patents. They said that Cook had retained them to institute litigation with a view to setting aside certain contracts and licenses. They stated that Cook would rather compromise the matter, receiving cash due him for materials furnished and labor performed, aggregating $1,015.42, and an additional sum of $7,500— $2,500 in cash and the balance in one or two years, represented by notes properly secured. Hatch in reply asked for a list of the several patents and applications for patents in which Cook claimed to have an interest, together with copies of the specifications of such applications as had not ripened into patents, with a statement of what claims had been allowed and in what condition the applications in the Patent Office were. Cook's counsel replied, under date of October 1st, that they did not desire at the time to furnish copies of applications. They said that McElroy knew what Cook had to sell, and if he indicated a disposition to accept the proposition they could satisfy both Hatch and McElroy with respect to the patent situation. On October 3, 1904, Hatch replied that McElroy was out of town. There the correspondence between the parties with reference to the matters involved in this litigation appears to have ended. In 1907 Cook sued in Chicago the Automatic Fire Protection Company of Maine for his bill of $1,015. An ultimate settlement of that particular controversy was arrived at, by the terms of which Cook received $700.

McElroy and Shepherd, and probably Cook as well, early appreciated that the inventions could be profitably and successfully exploited in any city only with the co-operation of some organization which had a regularly established telegraph and messenger service therein. Practically that meant that the assistance of the American District Telegraph Company and its subsidiary organizations were requisite to turn the inventions to profitable use. McElroy seems to have been in a position in which it was easy for him to get the ear of those influential in that corporation and to convince them that the inventions in question and others made by him and Shepherd were likely to prove highly useful. As early as the 18th of February, 1904, a contract between him and the American District Telegraph Company for the joint use of these inventions was entered into. The

business seems to have had a fairly rapid and quite extensive development. McElroy represented the defendant the Automatic Fire Protection Company of Maine, as did Shepherd. The Maine Company from time to time organized and sometimes wound up various subsidiary companies under laws of other states, some of which bore its name, and some of which, perhaps, were somewhat differently designated. For some reason, about May, 1909, the Automatic Fire Protection Company sold its business to the Fire Protection Development Company, also a Maine corporation, and for the next four years the payments of the American District Telegraph Company were made directly to the Fire Protection Development Company; then by an agreement of the 13th of June, 1913, the Automatic Fire Protection Company of Maine again entered into the direct receipt of such revenues.

It is not necessary or expedient in this opinion to attempt to unravel the precise relationship between these various companies. It may, I think, be taken as established, however, that all of them who are parties to this cause had, at the time they assumed any obligations or acquired any rights with reference to the patented devices in controversy, full knowledge of the various agreements to which Cook was a party and which have been heretofore recited. It does not appear that Cook, subsequent to October, 1904, did anything whatever to assert his alleged rights until the 3d of March, 1909, when, in the circuit court of Cook county, Ill., he filed a bill in equity against Nolen, Shepherd, McElroy, and the Automatic Fire Protection Company of Maine. In this bill he set up the contract of October 24th between himself and Nolen, said nothing whatever about any of the subsequent contracts to which he was a party, and alleged that Shepherd, McElroy, and the Automatic Fire Protection Company, with full knowledge of his rights in the premises, had been receiving gains and profits to one-half of which he was entitled. By that time the various individual defendants had removed from Chicago and were residing elsewhere, and the Automatic Fire Protection Company of Maine specially appeared and asserted that it had ceased to do business in Illinois and was not subject to suit therein. Perhaps because of these difficulties, plaintiff on the 17th of January, 1910, filed his bill in this court, and on the 25th of March of the same year dismissed his Illinois suit.

The theory of the second proceeding is that of the first. The later bill incorporates in substantially the same words all the material allegations of the earlier. In like manner it ignores the existence of any of the agreements, subsequent to that of October 24th, to which Cook and Nolen were parties. The principal respect in which the New York bill differs from the Illinois is in the persons, natural and artificial, who are made defendants to it. Nolen and McElroy were sued in New York, as they had been in Chicago. Shepherd, who was a defendant in the Western case, was not proceeded against in the Eastern. As an amendment to the bill made on the 25th of June, 1910, explains, he was not made a party because he did not reside in the Southern district of New York. Leave was then obtained to

make him a party defendant, so that he could be sued if at any time he came within that district. The Automatic Fire Protection Company of Maine was not made a party, very probably because Cook thought that its rights and obligations in the premises had been transferred to the Fire Protection Development Company of Maine, which had unquestionably taken over many of them. The last-named corporation was sued. Why the Automatic Fire Protection Company of New York was made a defendant here has not been stated. It was a mere subsidiary to the Automatic Fire Protection Company of Maine. There does not appear to have been any substantial reason why it should have been sued, even if it should be conceded that it might possibly have done something which upon plaintiff's theory of his rights might have made it technically liable to him. He has himself reached this conclusion and assented to the granting of its request that the bill as against it be dismissed.

In the pending case the American District Telegraph Company was made a defendant, doubtless in part for purposes of discovery, and in part in order that any decree which might be passed would safeguard its rights, while protecting for the future those of the plaintiff.

The defendants all answered. From the answers of some of them it appears that they were not all residents of the Southern district of New York; but, as they proceeded to answer fully on the merits, they waived their rights to object that they were not properly suable therein. The defendants McElroy and Nolen in their answers say that Cook forfeited all his rights under the contract of October 24th, because he failed and refused to do what was therein required of him. They say he did not make application for patents on Nolen's inventions and pay the cost of obtaining them; that he did not furnish means to develop such inventions, nor use his best skill and utmost endeavor to place them upon the market, nor did he commence the manufacture of appliances embodying them as soon as was practicable. Both Nolen and McElroy set up that Shepherd was an indispensable party. McElroy further alleged that he had acted under the agreement of June 29, 1903, and that under it he had, with Cook's knowledge and acquiescence, paid Nolen or accounted to him for all sums coming to Cook and Nolen under such agreement, and that consequently Cook had no claim against him. Nolen alleged that the contract of October 24th had been abrogated by subsequent agreements. The allegations of the other defendants need not be recited. They were for the most part either general denials or expressions of ignorance and demands for proof.

It was five years after the institution of his suit before Cook did anything else in the cause, except to file a general replication and obtain leave to amend the bill with reference to Shepherd in the manner above stated. On the 4th of April, 1914, he sought permission to amend his bill by making the Automatic Fire Protection Company of Maine a defendant. He also made the same request as to Shepherd, apparently unnecessarily, in view of what had been done four years before. Judge Hough denied this petition, on the ground that the granting of it might conceivably remove the bar of the statute of lim-

itations, which might possibly otherwise preclude Cook from then instituting a new suit. This cause came on for final hearing on the 19th of November. By the opening of the court on the morning of the 24th, which was the fourth day of actual trial, all parties had come to the conclusion that it would be better for everybody if the cause could be gotten into such shape that all the controversies growing out of the transactions which have been recited could be determined at once and for all, except in so far as the action of this court might be reversed or modified on appeal. It was accordingly stipulated that the bill should be considered amended so as to make the Automatic Fire Protection Company of Maine a defendant, and that that company would enter its appearance and file its answer. All the testimony taken in the cause should be held to have been taken in a proceeding to which it was a party. It reserved the right to rely upon any defense of limitations to the same extent as such defense would have been available to it, had it in fact been sued for the first time on November 24, 1914.

In its answer it set up the defense that the suit had not been brought within six years after the cause of action accrued; that the plaintiff was guilty of such laches as to make it inequitable to give him any relief; that Shepherd was an indispensable party; that Cook had forfeited all his rights under the contract of October 24th by failing to perform the obligations imposed on him thereby; and that by his attempted cancellation and repudiation of the agreement of June 29th he had shut himself off from any right to claim benefits thereunder.

Before inquiring whether the defense of limitations is available, it will be expedient to determine what contracts, if any, between the plaintiff and any of the defendants, are in force.

The contention of some of the defendants that the contract of October 24th has been abrogated by the failure of the plaintiff to perform the obligations imposed by it upon him does not seem to be persuasive. It is true that after June 29, 1903, Cook did little to develop and market the inventions, but before the end of March, 1904, nobody wanted him to, and after that time the defendants would not let him. It is equally certain that after the last-mentioned period Cook did nothing and spent substantially nothing, except in the payment of charges connected with the prosecution of the patents. But it was impossible, under the circumstances, that he should do anything. His failure to make any attempt to do any of the things required of him by the contract of October 24th may be evidence, and is evidence, and strong evidence, that he regarded the relations between himself and the others as governed by the agreements of June 29th and August 11th. But under all the circumstances it does not tend to show a breach by him of the contract of October 24th.

He says that the last-mentioned contract is the only one which is now in existence. In support of this contention he asserts, first, that the agreement of June 29th was a mere offer, from which either party could withdraw until it had been made a complete contract by acceptance; that Cook had withdrawn verbally at the stormy interview in March, 1904, or, if not, he had certainly done so by his letter of March

29, 1904. He claims that McElroy's attempted acceptance a week earlier was ineffective, because by the terms of the contract he had no right to accept at all until May 1, 1904; or, second, that McElroy's failure during all the years which elapsed prior to the filing of the bill of complaint in this cause, and subsequently, to make any of the payments required under the contract of June 29th in itself was such a total and complete breach as to put an end to it altogether.

I cannot think that the agreement of June 29th was a mere offer. McElroy and the Automatic Fire Protection Company proceeded at once to act under it. Cook knew they were doing so. He advised other people in writing that they held rights to the inventions now in question. He himself undertook to furnish them labor and materials required for the development and use of such inventions. After his attempted abrogation of the contract he continued to seek instructions from them as to the manufacture of devices for which they could have had no use whatever, were the parties to be governed solely by the contract of October 24th. Whatever the right conferred upon McElroy was, it was not a naked option given without consideration. Under it McElroy and the Automatic Fire Protection Company acted, spent money, and incurred liabilities. They paid for it, and had the right to it, and of it Cook could not deprive them. It follows that the contract of October 24th was replaced by, or merged in, those of June 29th and August 11th.

[2] The defendants contend that Cook cannot now rely upon either of those contracts, first, because he has repudiated them. That is true, but the defendants assert rights under them. The existence of those contracts is their defense to the claims made by Cook under the contract of October 24th. Under such circumstances a court of equity will adopt one view of those contracts or the other. If at the instance of the defendants it holds, as I do hold, that they were not abrogated, the mere fact that Cook tried to convince the court that they had been would not affect either his rights or the obligations of his adversaries. The duty of a court of equity to do justice between the suitors at its bar is not made any the less obligatory because one or both of them have claimed that to which they were not entitled. Doubtless the relief it may give is limited by the pleadings, as well as by the proofs; but such limitation is of no consequence in this case. Whatever may be said as to the silence of the original bill on the subject of the agreements of June 29th and August 11th at the final hearing in open court at the time, on November 24, 1914, when it was arranged that the Automatic Fire Protection Company of Maine be made a defendant, Cook reserved the right to stand on them if the court should be of opinion that his contention that the contract of October 24th was still in force could not be sustained. It may well happen that one who, by setting up an untenable claim, causes his adversary to change position, may be afterwards estopped from asserting rights that otherwise would have been his. But nothing of that character has happened in this case.

Assuming these contracts to have been originally valid and binding upon the parties, nothing that Cook has done or left undone with

reference to them has in a legal sense injuriously affected the rights of the defendants. The latter have remained in control of the inventions under the exclusive licenses granted by or under those agreements. They have done precisely what the contracts contemplated they should do. Cook had no active obligations thereunder. If the other parties be required now to account to him, they will be no worse off than they would have been, had they paid him from year to year the amounts to which under those contracts he would have been entitled. The assertion in McElroy's answer that he had paid Nolen Cook's part of the percentage reserved to Cook and Nolen is entirely unsupported by the evidence and is clearly without justification in fact. It follows that there has been on his part no such laches as should in a court of equity bar him from asserting any rights he might have under those agreements. Such a tribunal does not take anything from one suitor unless it is necessary so to do to avoid doing injustice to the other.

[3] The six-year period of limitation relied on by the Automatic Fire Protection Company of Maine is clearly inapplicable. Both of these agreements were under seal. A^tions upon them may be brought at any time within 20 years. Code Civ. Proc. N. Y. § 381. Section 390 provides that, where a cause of action which does not involve the title to, or possession of, real property within New York accrues against a person who is not then a resident of that state, an action cannot be brought thereon in one of its courts after the expiration of the time limited by the laws of his residence for bringing a like action.

The Automatic Fire Protection Company of Maine and the Fire Protection Development Company are Maine corporations. The period of limitations for suits upon sealed instruments is by the law of Maine the same as it is by that of New York, viz. 20 years. Section 93, c. 83, Revised Statutes of Maine. It is true that the seals upon the instruments in question are mere scrolls, which, while they are valid as seals in Illinois where the papers were executed, and in New York where the suit is pending, are probably ineffective in Maine to make the agreements to which they are attached sealed instruments. McLaughlin v. Randall, 66 Me. 226.

It might be interesting to inquire whether under the circumstances the requisites for a seal are to be determined by the laws of New York, of Illinois, or of Maine; but it is unnecessary. In applying the statute of limitations, equity seeks to follow the law; but it is not bound in doing so to go to the lengths which would be required to hold this suit barred merely because the parties, when they entered into what they supposed were contracts under seal, did not attach their seals in a way required by the laws of a state of which none of them who personally executed the papers were residents, and in which the performance of the contracts was not contemplated, except in the same way in which it might have been hoped for in any of the other 47 states of the Union.

It is possible that, within the meaning of section 390a of the Code of Civil Procedure, this suit is on a cause of action arising outside

the state of New York. In that case the period of limitations would be that prescribed by the law of Illinois, where the cause of action arose; that is to say, 10 years from the time when it accrued. Section 16, c. 83, Rev. St. Ill. Even if that be true, this suit appears to have been brought in time. McElroy accepted the contracts on March 22, 1904. The right to the first year's percentage of profits did not, therefore, arise before March 22, 1905, and perhaps not before May 1, 1905. Either date is less than 10 years prior to November 24, 1914.

It follows that Cook is entitled to an accounting under these contracts, bearing in mind, however, that, as has already been stated, he has no interest in such of Nolen's inventions as were made after August 11, 1903, if such limitation shall prove in point of fact material, as to which no opinion is now intimated.

In advance of the accounting it does not now appear to be necessary to anticipate any determination of the rights of McElroy, the Automatic Fire Protection Company of Maine, and the Fire Protection Development Company among themselves, and it might be inexpedient to attempt so to do. After the accounting has been had, such questions will probably be of easy determination.

A decree in conformity with this opinion may be drafted.